## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| ERLAN F. FERIA : | |
| 12 Dillon Court : | |
| Exton, PA 19341 : | CIVIL ACTION |
| : | |
| Plaintiff, : | No. |
| v. : | |
| : | |
| W.B. MASON CO., INC. : | **JURY TRIAL DEMANDED** |
| 59 Centre Street : | |
| Brockton, MA 02301 : | |
| : | |
| Defendant. : | |

## CIVIL ACTION COMPLAINT

Plaintiff, by and through his undersigned counsel, hereby avers as follows:

## INTRODUCTION

1. This action has been initiated by Erlan F. Feria (*hereinafter* referred to as "Plaintiff," unless indicated otherwise) against W.B. Mason Co., Inc. ("Defendant WB") for violations of the New Jersey Conscientious Employee Protection Act ("CEPA" – "N.J.S.A. 34:19-1 *et. seq*.), as well as applicable wage laws. As a direct consequence of Defendant WB's unlawful actions, Plaintiff seeks damages as set forth herein.[1]

## JURISDICTION AND VENUE

2. This Court has original subject matter jurisdiction over the instant action pursuant to 28 U.S.C. §§ 1332 because complete diversity jurisdiction exists. Plaintiff is a domiciliary, resident and citizen of Pennsylvania at the above-captioned address. Defendant WB is incorporated in Massachusetts, and its corporate headquarters and principal place of business is nationally

---

[1] This lawsuit, individual to Plaintiff, seeks damages only for actions occurring from March 30, 2020 and thereafter.

identified as the above-captioned address. Defendant WB is thus exclusively a resident, citizen and domiciliary of Massachusetts. In this lawsuit, Plaintiff alleges he was wrongfully terminated from his employment (as he was based in New Jersey), and he seeks in excess of $75,000.00 exclusive of costs and interest. Jurisdiction over this case in federal court is therefore appropriate under § 1332.

3. This Court may properly maintain personal jurisdiction over Defendant WB because its contacts with this state and this judicial district are sufficient for the exercise of jurisdiction over Defendant to comply with traditional notions of fair play and substantial justice, satisfying the standard set forth by the United States Supreme Court in *International Shoe Co. v. Washington,* 326 U.S. 310 (1945) and its progeny.

4. Venue is properly laid in this District pursuant to 28 U.S.C. §§ 1391(b)(1) and (b)(2), because Defendant WB conducts a vast amount of business in this judicial District, employed Plaintiff within this District, and the transactions and occurrences underlying the lawsuit herein occurred within this District.

## PARTIES

5. The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

6. Plaintiff is an adult individual, with an address as set forth in the caption.

7. W.B. Mason Co., Inc. ("Defendant WB") is a corporation which has generally operated over the last several years with approximately 70 distribution centers, over 3,000

employees, and it generally manufactures, distributes and sells office supplies and related products all over the United States.[2]

8.      At all times relevant herein, Defendant WB acted by and through its agents, servants and employees, each of whom acted at all times relevant herein in the course and scope of their employment with and for Defendant WB.

## FACTUAL BACKGROUND

9.      The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

10.     Plaintiff was hired by Defendant WB in or about November of 2008; and in total, Plaintiff was employed with Defendant WB for approximately 11.5 years (until being furloughed and/or laid off indefinitely).

11.     At all relevant times herein, Plaintiff was employed in the title of "Account Executive." Account Executives for Defendant WB are salespeople who solicit new business and manage existing accounts within which to sell or distribute Defendant WB's products (to third-part commercial businesses and residences).

12.     During Plaintiff's employment, he was employed through New Jersey. In particular:

   (A) Plaintiff was deemed based from Defendant's Cranbury, New Jersey location at 300 Prospect Plains Road, Cranbury, NJ 08512. This location is referred to within Defendant WB as the "South Brunswick" location;

   (B) Plaintiff was responsible for a book of clientele primarily throughout New Jersey wherein he consistently worked, although he had some clients in other states as well;

---

[2] Due to the COVID-19 pandemic, Defendant WB's overall internal workforce and operations have substantially changed. However, the summary herein is intended to outline Defendant WB's overall pre-pandemic generalized business operation(s).

(C) Plaintiff's direct supervisor was Daniel Iannaccone (Sales Manager), and he was indirectly supervised by Cristina Hall (Branch Manager) and Eric Gervais (Regional Manager). This management hierarchy, like Plaintiff, were based from the South Brunswick location;

(D) Plaintiff participated in weekly meetings taking place at Defendant WB's South Brunswick location; and

(E) The human resources management Plaintiff communicated with during his employment was also based at the South Brunswick location. Indeed, Plaintiff's permanent termination (although labeled by Defendant as a "temporary furlough") occurred by way of notice from Human Resources Management at the South Brunswick location.

13. Plaintiff's last physical day of work with Defendant WB was on Friday, March 27, 2020. By e-mail from a former Human Resources Manager based within the South Brunswick location, Plaintiff was informed at 3:31 P.M on March 27, 2020 that Defendant WB was engaging in layoffs due to the "impact of COVID-19." Plaintiff was further instructed that he was being subject to a "temporary furlough" effective Monday, March 30, 2020. The adverse action (termination) for which Plaintiff seeks relief in this lawsuit therefore occurred on (or effective) March 30, 2020.

14. Defendant WB furloughed *the majority* of its sales workforce (and those in the title of Account Executive) throughout the United States in the same timeframe of late March 2020. Approximately seventy-five percent (75%) of Plaintiff's counterparts in similar roles to him were also subject to a furlough like him within the South Brunswick location (or approximately 30 out of nearly 40 Account Executives). And Plaintiff believes and therefore avers that more than 500 similarly situated counterparts to him were furloughed in other locations *nationwide*.

15. Plaintiff does not in any manner dispute the legitimacy of Defendant WB's need – for a legitimate business rationale – to effectuate the layoffs, terminations or "temporary furlough" of Account Executives (or sales people in general) due to the impact of the COVID-19 pandemic.

It is of course common knowledge that there was a dire impact on many industries warranting legitimate reductions in force, job eliminations, and layoffs.

16. The crux of Plaintiff's lawsuit herein is however that he: (a) was a <u>very</u> high-performing Account Executive; (b) had a <u>very</u> substantial book of business and revenue generation (selling millions of dollars' worth of products); (c) was intentionally selected ***as a throw-in*** to the reduction-in-force because he complained of multiple illegalities (outlined in more detail *infra*); and (d) would have otherwise been one of those Account Executives retained (if not for legally-protected complaints), as Defendant WB in fact <u>kept</u> less tenured, less-experienced, lesser-qualified, lower-performing, and other Account Executives without comparable revenue generation.³

17. Leading up to Plaintiff's selection to be thrown into the nationwide "temporary furlough," which was for all intent(s) and purposes *a permanent termination*, Plaintiff specifically complained about and opposed <u>numerous unlawful practices</u> by Defendant WB. Such complaints by Plaintiff included concerns about the following:

> (1) **Nationwide Commissions Scam**: Defendant WB has throughout Plaintiff's tenure engaged in a ***nationwide*** illegal commissions scam concerning all Account Executives in all states in which they have been employed (not just New Jersey). On a continual and pervasive basis, Defendant WB – by and through its management – has retroactively reduced commissions ***already earned*** by commissioned Account Executives. **<u>After</u>** Account Executives **<u>have already earned</u>** commissions, Defendant WB has altered (to the detriment of employees):

---

³ An employer who selectively cleans house cannot hide behind convenient euphemisms such as "downsizing" or "streamlining." Whether or not trimming the fat from a company's organizational chart is a prudent practice in a particular business environment, the employer's decision to eliminate specific positions must not be tainted by a discriminatory or retaliatory animus. *See LeBlanc v. Great Am. Ins. Co.*, 6 F.3d 836, 844-45 (1st Cir.1993), *cert. denied*, 511 U.S. 1018, 114 S.Ct. 1398, 128 L.Ed.2d 72 (1994); *Goldman v. First Nat'l Bank*, 985 F.2d 1113, 1118-19 (1st Cir.1993); *Montana v. First Fed. Sav. & Loan Ass'n*, 869 F.2d 100, 105, 107 (2d Cir.1989); *Dister v. Continental Group, Inc.*, 859 F.2d 1108-1115 (2d Cir.1988); *Pearlstein v. Staten Island Univ. Hosp.*, 886 F.Supp. 260, 268-69 (E.D.N.Y.1995)) (Goldman, 985 F.2d at 1118 n. 4; *Maresco v. Evans Chemetics*, 964 F.2d 106, 111 (2d Cir.1992); Mesnick, 950 F.2d at 825; *Pearlstein*, 886 F.Supp. at 268-69.).

>    (a) percentage of commissions due; (b) categories (or what is internally referred to as "buckets") as to commission entitlements of Account Executives; (c) fraudulently inflated costs to falsely reduce commission entitlements of Account Executives; (d) calculations concerning donation, rebate, and design time to reduce commissions; and (e) created other alleged qualifying criteria that reduced commissions after already earned. These are just <u>several examples</u> of the ways in which Defendant WB falsely reduced commissions nationwide as to all commissioned Account Executives in essence stealing owed wages from such employees after they had already been earned;[4] and
>
> (2) **Unlawful Fraud and Price Gouging**: Defendant WB only cared about profit margin, and it makes little or no effort to comply with applicable consumer protection laws. Defendant WB has a pervasive history of misrepresenting pricing information, bumping rental pricing without knowledge (such as with water and coffee machines), retaining deposit credits (such as with Blizzard Water), and scamming clientele in many other ways. Defendant WB has either actively misled or unbeknownst to clientele adjusted upward pricing on a surreptitious basis. Plaintiff expressed numerous concerns about the legality of such actions leading up to his termination. Additionally, N.J.S.A. §§ 56:8-107 *et. seq.* (the New Jersey Consumer Fraud Act) and Executive Order 103 (effective 3/9/20) prohibited excessive charges for personal protective equipment ("PPE") or what is commonly referred to as price gouging. Defendant WB was demanding Plaintiff and other Account Executives increase pricing by upwards of forty percent (40%) on pre-existing purchases by customers (and hence raising customer "purchase prices" by well over ten percent (10%). Shortly after Plaintiff's objections, he was terminated. ***Defendant WB's "Margin Management Files" will conclusively demonstrate*** (as obtained during discovery) the fraud against clientele and price gouging as outlined herein (in addition to other relevant data).

---

[4] Defendant has on a massive scale defrauded **all** of its commissioned Account Executives knowingly violating state and federal wage laws, which even impose criminal penalties for wage theft from employees. Defendants' theft from employee commissions on a "retroactive" basis is known and perpetuated from Defendant WB's actual owners, as admitted in recordings by Defendant WB's higher-level management. Unlike every other company in the United States, Defendant WB refuses to provide data in writing to Account Executives of any changes in commission plans or actual commission plans. Instead, Defendant WB continually steals or skims from Account Executives who then notice reduced commissions on subsequent commissions statements (sometimes comprising reductions of several thousand dollars in a pay period). When Plaintiff demanded commission documentation from Defendants prior to his termination from employment, he was presented with a legal non-disclosure contract *just to even be permitted to review a small segment of his own commission data*. Defendant's Account Executives are owed millions of dollars across the United States for such pervasive fraud and wage theft against them.

18.     The above examples are just the proverbial tip of the iceberg. Plaintiff also complained about and expressed concerns regarding numerous other issues of consumer fraud and unlawful compensation practices towards employees.

19.     In addition to Plaintiff being a retaliatory throw-in into an otherwise legitimate reduction in Defendant WB's workforce (in violation of the CEPA), Defendant WB (through its management) also committed *clear and undeniable* wage violations by directing Plaintiff to perform *actual* work during his furlough.

20.     From March 30, 2020 through on or about February 28, 2021 (roughly 11 months), Plaintiff unwittingly performed "labor" for Defendant WB without knowing he was: (a) functioning as an employee; and (b) entitled to compensation under applicable state and federal law(s). More specifically, the sequence of events was as follows:

>  (1) In conjunction with Plaintiff's furlough on March 27, 2020, Plaintiff spoke with Gervais identifying *inter alia* that he had a significant book of business and inquired about what he should do when clients communicate with him. Gervais told Plaintiff to "work through [Iannaccone] with that."[5]
>
>  (2) Iannaccone then spoke with Plaintiff. Iannaccone asked if Plaintiff would be available to have an ongoing dialogue with him and answer questions on Plaintiff's accounts during Plaintiff's furlough. Since Plaintiff was expressly led to believe that he was only temporarily furloughed and that Iannaccone was maintaining his accounts, Plaintiff agreed to do whatever was necessary to help Iannaccone knowing it could require significant time on the part of Plaintiff though (but primarily to ensure Plaintiff was not prejudiced by any account being harmed, since he didn't know at the time he was never being returned to work).
>
>  (3) For nearly 11 months, Plaintiff answered calls from customers, responded to Iannaccone, and helped coordinate matters and refer account representatives to Iannaccone. At Iannaccone's direction, Plaintiff assisted anytime helpful or necessary, such as with Sherry Kupstas (a Billing Coordinator). She was in

---

[5] Gervais also told Plaintiff all of Plaintiff's accounts would remain under Plaintiff's sales number during the furlough, that Plaintiff's accounts would be returned to him, and that Plaintiff would be given notice if any accounts were to be reassigned.

      contact with Plaintiff to have him help resolve overdue collections from his client.[6] Plaintiff helped, facilitated and ensured accounts receivables were paid.

(4) **No** management (whom Plaintiff worked with) within the 11 months directed Plaintiff not to work for Defendant WB. Instead, coordinators or management actively used and exploited Plaintiff each time thanking him as he assisted Defendant WB. Plaintiff literally worked during almost every week of the entire 11 months on some aspect of Defendant WB's business in light of promises each account was going to remain his upon return to work from furlough.

(5) Plaintiff was **never** paid minimum wage or any wage(s) **during** the course of his 11 months of work (while working). This constituted violation(s) of state and federal wage law(s).

21.    In the months leading up to February 28, 2021, Plaintiff had come to learn that his accounts were being reassigned and he likely would not be returned from any potential furlough. Plaintiff sought information from Iannaccone who then ignored Plaintiff. Feeling terribly misled and used, Plaintiff engaged in substantial research realizing that Defendant WB likely violated state and federal wage laws by having him maintain his accounts (as Plaintiff could not possibly meet any criteria as a "volunteer").

22.    Between February 28th through March 1st of 2021, Plaintiff escalated numerous concerns to Roger Ahlfeld (Vice President of Human Resources) via e-mail(s). Among those concerns were that he was exploited, not paid in violation of state and federal wage laws for his near 11 months of being exploited by Defendant WB, and that Defendant WB caused him problems with his ongoing entitlement to unemployment benefits (by and through required disclosures Plaintiff had to make to the Department of Labor ("DOL")).

---

[6] For example, Plaintiff assisted Iannaccone and Kupstas collect $21,949.39 at their request on an account assigned to Plaintiff in May of 2020.

23. During the chain of e-mail communications between February 28th through March 1st of 2021, Plaintiff expressly stated: "I'm requesting that I no longer am to be contacted by anyone at W.B. Mason to conduct any work-related function."

24. Damages to Plaintiff are substantial in that he was not compensated for the aforesaid 11-month timeframe from March 30, 2020 through February 28, 2021, and Plaintiff has endured ongoing problems with his entitlement to and collection of unemployment compensation.

25. The substantial need for Plaintiff to continue working **during** his furlough at the direction and request(s) of Defendant WB management *is further illustrative* of how necessary Plaintiff was (as an employee) and further corroborates that the rationale to **illegitimately** *throw him into* an otherwise legitimate reduction-in-force was pretextual.

### First Cause of Action
### Violations of the New Jersey Conscientious Employee Protection Act (" CEPA")
### (Wrongful Termination - Retaliation)

26. The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

27. Plaintiff was terminated for several instances of engaging in protected activity by making complaints and/or for objecting to unlawful actions in the workplace as outlined in significant detail in this Complaint.

28. Although Plaintiff was labeled as being on a "temporary furlough," it was a functional permanent termination with no intent to ever return him to work.

29. These actions as aforesaid constitute violations of CEPA.

### Second Cause of Action
### Violations of the New Jersey Wage Payment Law ("NJ WPL")
### (Failure to pay wages or commissions)

30. The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

31. Plaintiff was not paid base wages, a draw, or commissions from March 30, 2020 through February 28, 2021 ("the furlough timeframe").

32. Plaintiff was unwittingly providing compensable labor on an extensive basis during the furlough timeframe under the believe he was merely maintaining a good relationship with his accounts for when he was returned to work from furlough.

33. Plaintiff continually communicated with Iannaccone during the furlough timeframe. Plaintiff was never told he should not work; and instead, Defendant WB (through Iannaccone) expressly and repeatedly sought his assistance with work-related matters.

34. During this timeframe, Plaintiff should have been paid wages, draw(s) and/or commissions. Defendants committed knowing violations of the NJ WPL. Such violations warrant full damages, "liquidated damages," and an award of attorney's fees.

### Third Cause of Action
### Violations of the New Jersey Wage and Hour Law(s)
(Failure to pay minimum wage(s))

35. The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

36. During the furlough period, Plaintiff was not paid any wages, let alone minimum wages.

37. These actions by Defendant WB constitute violations of the New Jersey Wage and Hour Law(s). Such violations warrant full damages, "liquidated damages," and an award of attorney's fees.

## Fourth Cause of Action
## <u>Violations of the Fair Labor Standards Act ("FLSA")</u>
### (Failure to pay minimum wage(s))

38. The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

39. During the furlough period, Plaintiff was not paid any wages, let alone minimum wages.

40. These actions by Defendant WB constitute violations of the New Jersey Wage and Hour Law(s). Such violations warrant full damages, "liquidated damages," and an award of attorney's fees.

**WHEREFORE**, Plaintiff prays that this Court enter an Order providing that:

A. Defendant WB is to compensate Plaintiff, reimburse Plaintiff, and make Plaintiff whole for any and all pay and benefits Plaintiff would have received had it not been for Defendants WB's illegal actions, including but not limited to back pay, front pay, salary, pay increases, bonuses, insurance, benefits, training, promotions, reinstatement, and seniority.

B. Plaintiff is to be awarded liquidated and punitive damages, as permitted by applicable law, in an amount believed by the Court or trier of fact to be appropriate to punish Defendant WB for its willful, deliberate, malicious and outrageous conduct and to deter Defendant WB or other employers from engaging in such misconduct in the future;

C. Plaintiff is to be accorded other equitable and legal relief as the Court deems just, proper, and appropriate (including but not limited to damages for emotional distress / pain and suffering);

D. Plaintiff is to be awarded the costs and expenses of this action and reasonable attorney's fees as provided by applicable federal and state law; and

E.       Plaintiff is to be given a trial by jury.

                                      Respectfully submitted,

                                      **KARPF, KARPF & CERUTTI, P.C.**

By:   _____

                                      Ari R. Karpf, Esq.
                                      3331 Street Road
                                      Two Greenwood Square, Suite 128
                                      Bensalem, PA 19020
                                      (215) 639-0801

Dated: March 29, 2021